IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BRARAILTY DOWDELL, | : |
| | : CIVIL ACTION |
| Plaintiff, | : |
| v. | : No. 15-cv-06806 |
| | : |
| COMMUNITY COLLEGE OF PHILADELPHIA, | : (Hon. Nitza I. Quiñones Alejandro, J.) |
| | : |
| Defendant. | : |

**REPLY MEMORANDUM OF LAW OF DEFENDANT,
COMMUNITY COLLEGE OF PHILADELPHIA,
IN FURTHER SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Defendant, Community College of Philadelphia ("CCP"), by and through its undersigned counsel, hereby submits this Reply Memorandum of Law in further support of its Motion for Summary Judgment (the "Motion"). In short, Plaintiff has filed a response in opposition (the "Opposition") that misapprehends the law and completely distorts the record facts in a desperate attempt to make out a claim despite the complete absence of any evidence of discrimination. This flagrant distortion of the law and the facts requires rejoinder.

**I.      INTRODUCTION**

Distilled to its essence, Plaintiff's Opposition is nothing more than a thinly-veiled attempt to distract the Court, often in reliance on misconstrued "facts," from the key issue in this case – whether any of the actions taken by CCP were in any way related to Plaintiff's race and gender. Plaintiff throws unsubstantiated, inaccurate allegations against the wall in the hope that something will stick. That hope is in vain, however, as the record evidence offers no support for these allegations, or for Plaintiff's claims of discrimination. The Opposition is replete with postulations as to why certain actions were allegedly taken. However, mere speculation does not

rise to the level of proof required to withstand summary judgment.  Plaintiff's Opposition confirms that he can set forth no evidence of race discrimination, gender discrimination, or "combined" race and gender discrimination as a matter of law.  Plaintiff's unsupported protestations to the contrary notwithstanding, there are no disputed issues of material fact, and Defendant is entitled to summary judgment in its favor.

## II.     ARGUMENT

### A.     Plaintiff's Opposition Confirms That He Cannot Establish A *Prima Facie* Case Of Discrimination.

Plaintiff's Opposition demonstrates that there is no question that he has failed to make out a *prima facie* case of race and/or gender discrimination.  First, as demonstrated in CCP's Motion, Plaintiff was objectively unqualified for the English Generalist position.  Second, despite Plaintiff's distortion of the facts in a misguided attempt to establish his claims, the record evidence demonstrates that there is nothing to give rise to an inference of discrimination in this case.  Accordingly, Plaintiff has failed to meet his burden of establishing a *prima facie* case.

#### 1.     There Is No Question Of Fact As To Whether Plaintiff Was Objectively Qualified For The English Generalist Position.

In an attempt to meet the second element of a *prima facie* case – that he was qualified for the position sought – Plaintiff relies on conclusory allegations that are not supported by the facts of record.  As CCP explained in its Motion, the full-time English Generalist position required a Master's Degree or above in English or a closely related field.  See Motion at 3.  Neither Plaintiff, nor his similarly situated comparator, A.F., a White female, who was also not selected for hire, had a Master's degree in English or a closely related field.  Giving every benefit of the doubt and consideration to Plaintiff and his similarly situated comparator, Drs. Gay and Thompson used the CCP Board's requirement that part-time faculty have 18 credits in the relevant discipline to determine if Plaintiff and A.F. had *more* than 18 graduate credits in the

English discipline or literary studies.  Id. at 14.  They did not.  This assessment is not subjective, but is based entirely on the graduate courses reflected on an applicant's transcript.  Plaintiff's transcript makes clear that he did not have more than 18 graduate credits in English or in courses involving significant attention to the English language or literary study.  See id. at Ex. Q. Accordingly, Dr. Gay and Dr. Thompson objectively determined that he did not meet the minimum qualifications for the position.

In a vain attempt to establish his case, Plaintiff makes the unsupported conclusion that the degree he holds from Boston University – a Master of Science in Film – is actually somehow a degree in "screenwriting."  See, e.g., Opposition at 1 (claiming Plaintiff "received a Master's of Science in Film *with a concentration in screenwriting*"); 9 ("Plaintiff Dowdell's graduate degree *had a concentration in screenwriting*"); 12 ("Plaintiff Dowdell's *degree in screenwriting* qualified him for hire.") (emphasis added).[1]  But nowhere on Plaintiff's transcript is it even indicated that he had a concentration, and much less a *degree*, in screenwriting.

The letter Plaintiff offers from the Dean of Boston University's College of Communication specifically states that the College did not offer degrees in discrete sub-disciplines at the time Plaintiff received his Master's of Science.  See Motion, Ex. Y.  Plaintiff inaccurately posits that in 1999, Boston University "changed" its graduate degree to a Master of Fine Arts.  This again is not supported by the Dean's letter, which indicates that the College simply *ceased awarding* the Master of Science.  More importantly, however, Plaintiff's reliance on this letter (which unequivocally does not support his position that he somehow has a Master of Fine Arts in Screenwriting) is immaterial.  The information about the progression of degrees

---

[1]  Plaintiff is incorrect in his conclusion that CCP "recognized [him] as having that degree [in screenwriting]".  Plaintiff cites a letter from 2003 in which Dr. John Howe indicated that he has a "degree in Film/Screenwriting."  See Opposition, Ex. W.  However, this letter – written in reliance on the information Plaintiff self-reported on his application – was in reference to Plaintiff's teaching classes on a part-time basis, and was not in reference to his application for hire to the full-time English Generalist position in 2015.

offered at Boston University was not available to Dr. Gay or Dr. Thompson when they reviewed Plaintiff's transcript; they could not have known, nor were they required to know, about the evolution of Boston University's degree classifications. Plaintiff's transcript accurately identifies the courses he did in fact take. Those courses did not involve significant attention to the study of English. The determination that Plaintiff lacked 18 graduate credits in the study of the English language was an objective determination, and Plaintiff has therefore failed to establish the second element necessary to make out a *prima facie* case.[2]

### 2. The Record Evidence Provides No Support From Which The Court Can Draw An "Inference" Of Discrimination.

An inference of discrimination, as required to establish a *prima facie* case under Title VII, does not arise simply from an employee's subjective belief that his or her race or gender somehow influenced the challenged employment action. Kier v. F. Lackland & Sons, LLC, 72 F. Supp. 3d 597, 609 (E.D. Pa. 2014). Instead, a plaintiff "must produce 'evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion[.]'" Id. at 608 (quoting Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 355 (3d Cir. 1999)). This, Plaintiff has not done, and cannot do. Instead, he relies on speculative conclusions that are not supported by the record, and misconstrues the record facts that *are* available.

Specifically, Plaintiff relies on the following in an attempt to argue that the Court can somehow infer that the decision not to hire him was discriminatory: (1) his contention that Dr. Gay and Dr. Thompson are outside his protected class and that they have made certain remarks or actions allegedly indicating a racial bias; (2) his contention that statistical data regarding the

---

[2] Plaintiff is correct that *subjective* assessments of qualifications should be considered at a later stage of the McDonnell Douglas test. However, even if the Court concludes that the examination of Plaintiff's transcript involved an assessment of his subjective qualifications, that assessment is subject to review at the *pretext stage* of the McDonnell Douglas analysis and not, as Plaintiff suggests, by the fact finder. For the reasons described in section II.B below, Plaintiff has put forth no evidence that the decision not to recommend him for hire was based on anything other than the determination that he lacked the necessary educational qualifications.

hiring of African American males at CCP supports his claim; (3) his contention that CCP promoted Plaintiff's accomplishments; and (4) his contention that one other faculty member was hired who Plaintiff believes is similarly situated to him.  None of these contentions, standing alone or collectively, support an inference of discrimination when considered in light of the actual evidence of record.

First, his contention that Dr. Gay and Dr. Thompson are outside Plaintiff's protected class does not support an inference of discrimination.  Moreover, it is not true as to Dr. Gay, who is African-American.  An employer is able to make employment decisions regarding members of protected classes that are not motivated by discrimination.  The United States Court of Appeals for the Third Circuit has thus made clear that "the race of the selecting official is not a sufficient circumstance to establish a *prima facie* case of discrimination by itself."  Iadimarco v. Runyon, 190 F.3d 151, 156 (3d Cir. 1999).  See also Bristow v. Pennsylvania, No. 13-1247, 2014 WL 7232105, at *6 (E.D. Pa. Dec. 18, 2014) (Quiñones Alejandro, J.) (holding African American supervisor's selection of African American candidate over White plaintiff insufficient to establish reverse racism claim where supervisor had previously selected non-African Americans to fill position); Wyble v. Life's Work of W. PA, No. 05-1478, 2007 WL 626142, at *6 (W.D. Pa. Feb. 26, 2007) (rejecting plaintiff's argument "that because [her superior] was an African American and she is Caucasian, these [allegedly discriminatory] incidents must have occurred because of her race.").

Grasping to breathe air into his lifeless claims, Plaintiff points to alleged "remarks and actions of both Dr. Gay and Dr. Thompson that support an inference of discriminatory animus." Plaintiff himself acknowledges that neither Dr. Gay nor Dr. Thompson have ever made any comments to him that he views as racially discriminatory or offensive, see Motion, Ex. A at 62-

63; 72.  Simply stated, the allegations lodged in the Opposition are makeweight -- indeed, taking them as true for purposes of the Motion, they are woefully insufficient to support Plaintiff's claims.  With respect to Dr. Gay, Plaintiff claims that when asked why she did not protect African American faculty, Dr. Gay replied "that she did not feel the African American faculty backed her."  Opposition at 6.  First, this is a hearsay statement which Dr. Gay denies ever making.  See Gay Dep. at 177, attached hereto as Ex. A.  But even if the Court accepts this statement as true, it is belied by the facts, which demonstrate that Dr. Gay has, in fact, supported African American faculty.  In 2015 alone, Dr. Gay recommended two African Americans for hire to the position to which Plaintiff applied; she also recommended for hire the only other African American male candidate who was forwarded to her by the Hiring Committee.[3]  Indeed, with respect to Plaintiff, Dr. Gay went above and beyond the job required of her by closely reviewing the content of each of the courses he took (to the extent they were available online) and made every effort to find a way to see if Plaintiff could "fit" the stated qualifications.  See Motion, Ex. D at 33.  Dr. Gay even testified that if Plaintiff had been qualified, *she would have recommended that he be hired*.  See Opposition, Ex. G at 196-196.  This does not support any inference of discrimination on the part of Dr. Gay.

Plaintiff's allegations against Dr. Thompson are equally untenable.  Plaintiff again misrepresents the facts by claiming that Dr. Thompson "was witnessed smiling *at a racially insensitive joke*."  Opposition at 17.  Plaintiff refers to the testimony of Paul Wright, where he described "what [he] thought was an inappropriate *story*" told by Dr. John Howe, a former

---

[3]   In fact, the African American female faculty member who relayed this hearsay comment was recommended for hire by Dr. Gay.  See Dep. of Ardencie Hall-Karambe, attached hereto as Ex. B, at 13.  Furthermore, as Plaintiff points out, between 2010 and 2015, Dr. Gay recommended for hire 7 African American men and 19 African American women.  See Opposition at 8.  Indeed, Plaintiff was the *only* African American male forwarded to Dr. Gay for consideration who she did not recommend for hire, and she did not recommend him because he did not meet the minimum qualifications.  See Motion at 27-29.

Hiring Committee chair, wherein Dr. Howe, on Martin Luther King Day, used a Southern accent to describe the way his teacher told his class that their school was to be integrated. See Opposition, Ex. N. Wright's recollection does not include any racially insensitive jokes or remarks, but instead was a re-telling of what Dr. Howe remembered his teacher telling him. In any event, the fact that Dr. Thompson allegedly smiled at this story does not in any way make out an inference of discrimination.[4]

But even if the Court accepts as true Plaintiff's contentions about the "remarks and actions" of Dr. Gay and Dr. Thompson, they are nothing more than stray remarks. The Third Circuit has made clear that "[s]tray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of the decision." Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 545 (3d Cir. 1992). Furthermore, such remarks "must be considered *in toto* in light of the nature and context in which the comment was made." Nunn v. NHS Human Servs., Inc., 110 F. Supp. 3d 554, 569 (E.D. Pa. 2015). Neither Dr. Gay's alleged statement, nor Dr. Thompson's alleged smile, were made in the context of the decision not to hire Plaintiff. Dr. Gay's statement was allegedly made in 2007, which is *eight years* before the hiring decision. Opposition, Ex. P at 92. Dr. Thompson's smiling at Dr. Howe's story about his childhood allegedly occurred in 2001, nearly *fifteen years* before the hiring decision. Opposition, Ex. N at 60-61. These unconnected, remote incidents, even if accepted as true, are simply insufficient to establish an inference of any discrimination in the decision to hire Plaintiff.[5]

---

[4] Nor does the fact that she is friends with Dr. Howe, who is not alleged to have any involvement in this case whatsoever. Indeed, Plaintiff's own evidence demonstrates that it was Dr. Howe who recommended Plaintiff to teach certain classes in 2003. See Opposition, Ex. W.

[5] Nor can any merit be given to Plaintiff's allegation that the fact that Dr. Thompson filed a complaint of sex discrimination is somehow "extremely relevant of discriminatory animus as she claimed the African American male diversity officer was bias." (sic). Opposition at 17. There is absolutely no legal support for Plaintiff's untenable

More importantly, these stray "remarks and actions" were not made by the final decision-makers with respect to Plaintiff's hire.  The record evidence unequivocally demonstrates that the final decision-maker with respect to hiring decisions is CCP's President, Dr. Guy Generals (who is entirely within Plaintiff's protected class as an African American male).  See Motion at 30.  Plaintiff again completely misrepresents the facts to the Court in describing the final interview with Dr. Generals as "ceremonial."  Compare Opposition at 4 (describing the interview as ceremonial and citing to ¶ 28 of CCP's Answer and New Matter) with Opposition, Ex. J, CCP's Answer and Affirmative Defenses to Plaintiff's Complaint at ¶ 28 (indicating the exact opposite: that the interview with Dr. Generals is *not* ceremonial).  Plaintiff does not believe that Dr. Generals discriminated against him.  See Motion, Ex. A, at 80.  Because Dr. Gay and Dr. Thompson's alleged remark and smile, even if accepted as true, were unconnected to the hiring decision, were temporally remote from the decision, were not offensive or insensitive in context, and were not made by the actual decision-makers, they are entitled to no weight, and do not give rise to an inference of discrimination sufficient to overcome summary judgment.[6]

---

position that an inference of discrimination can be made from the fact that an alleged decision-maker has made a discrimination claim in the past.

[6]     Even if the Court construes Dr. Gay as a final decision-maker because she made the recommendation not to forward Plaintiff to Dr. Generals, there is still no evidence sufficient to give rise to an inference of discrimination, as there is no evidence that Dr. Gay acted with any bias on the basis of race or gender.  Moreover, Plaintiff cites to no record evidence, because none exists, for his conclusory assertion that "Dr. Thompson was a decision maker."  In fact, the evidence makes clear that the opposite is true.  See Motion at 7 (citing to record testimony that Dr. Gay considers Dr. Thompson's input, but ultimately makes her own recommendations).  The Court need not accept as true Plaintiff's allegations where they are unsupported, and indeed contradicted, by the record evidence.  See Furry v. Lehigh Valley Health Sys., 902 F. Supp. 2d 645, 650 (E.D. Pa. 2012) ("The nonmoving party cannot avert summary judgment with speculation or conclusory allegations, such as those found in the pleadings, but rather, must present clear evidence from which a jury can reasonably find in its favor.").

Plaintiff's alternative argument that CCP is somehow liable under a "cat's paw" theory is similarly doomed to failure, as, for the reasons set forth herein and in the Motion, there is no evidence to support a conclusion that Dr. Thompson was motivated by discriminatory animus or bias toward Plaintiff.  A plaintiff may not proceed under a cat's paw theory in the absence of evidence that "*those exhibiting discriminatory animus* influenced or participated in the [adverse employment] decision[.]"  Greenawalt v. Clarion Cty., 459 F. App'x 165, 169 (3d Cir. 2012) (citation omitted, emphasis added) (affirming summary judgment for employer and holding plaintiff failed to point to any evidence that non-decision-maker actually had discriminatory, bad intent toward him).

Plaintiff next contends that an inference of discrimination can arise from a review of the hiring statistics of African American males in the CCP English Department. Plaintiff's contention is a gross mischaracterization of the record. While Plaintiff correctly notes that the "usefulness [of statistics] depends on all the surrounding facts and circumstances[,]" Opposition at 18, he then conveniently ignores the very facts and circumstances surrounding the hiring statistics *here*. The surrounding facts and circumstances demonstrate that there is simply a dearth of African American male applicants to the English Department. See Wright Dep., Motion Ex. AA, at 32. Plaintiff's allegation that "Drs. Gay and Thomson hired one African American male in ten years to its English Department" is not evidence of discrimination when viewed in context – that between 2006 and 2015, only *two* African American men were forwarded to them by the Hiring Committee, and that African American men comprised, on average, only 1.69 percent of the total number of applicants to the English Generalist position each year. See Motion at 27-29. CCP is under no obligation, as Plaintiff seems to suggest, to match "the national average" in terms of hiring. See, e.g., Chandler v. Univ. of Pennsylvania, 927 F. Supp. 2d 175, 183 (E.D. Pa. 2013) (rejecting plaintiff's statistics-based arguments where she alleged that percentage of African Americans on university faculty was not commensurate with the overall U.S. population, as "[t]hat is not enough to plausibly claim that Penn intentionally discriminated against *her* on the basis of race when it refused to hire her for a job[.]"). Nor is Plaintiff entitled to preferential treatment simply because CCP has a higher percentage of African American students.[7] In contrast, as CCP emphasized in its Motion, Title VII prohibits employers from making decisions on the basis of race. See Motion at 30.

---

[7] Indeed, at the pretrial conference, the Court made clear that the demographics of CCP students are not relevant to the issues in this case.

Plaintiff's third contention – that the Court should consider the "unique circumstances" of this case (i.e., the fact that CCP highlighted his accomplishments in various forms) – lacks merit and does nothing to support an inference of discrimination here.  Plaintiff himself admitted that he was *benefited* by the fact that he was showcased as an "accomplished faculty" member.  See Dowdell Dep. at 26-27, attached hereto as Ex. C (indicating that he believes it is good for him that posters on which he appeared increased his visibility).  There is neither legal support for nor logical underpinning to the contention that simply because an employer supported an employee by highlighting his accomplishments, that a later decision not to promote that employee into a particular position somehow entitles that employee to an inference of discrimination.

Finally, Plaintiff contends that he can establish a *prima facie* case by showing that a similarly situated employee was treated more favorably.[8]  This contention again completely distorts the facts of record.  First, J.B., the faculty member to whom Plaintiff refers, is not similarly situated.  Though Plaintiff claims – without any support – that J.B. "did not have 18 or more graduate credits with a significant focus in the English Language," a cursory review of his transcript shows that he certainly *did* have such credits.  See Opposition, Ex. U (demonstrating that J.B. had many courses in English and literary study, including Literature for Children and Adolescents, Adult Literacy, Literacy and Learning Differences, Teaching Reading and Study in Colleges and Universities, and Assessing Language and Learning Differences, among others).  Plaintiff appears to misunderstand how graduate credits are awarded by the University of Pennsylvania, where J.B. received his degree.  As Dr. Gay, Dr. Thompson, and CCP's counsel explained to Plaintiff's counsel during depositions, the University of Pennsylvania awards

---

[8]  Plaintiff disrespectfully refers to this employee as "EGB" throughout his Opposition, which are the initials that appear on the employee's graduate transcript.  Plaintiff's counsel has been reminded on multiple occasions that the person who was previously known by the initials EGB is presently known by a different name, with the initials J.B., which is how CCP will refer to him throughout this Reply.

"credit units," one of which is not the equivalent of one "credit" at other institutions.  See Gay Dep. at 97-98 (attached hereto as Ex. A); Thompson Dep. at 112-113 (attached hereto as Ex. D), and Course Credit Information, a document prepared by the University of Pennsylvania and provided to Plaintiff's counsel (attached hereto as Ex. E), explaining that "[a] course unit (CU) is a general measure of academic work over a period of time, typically a term (semester or summer). … One CU is usually converted to a four-semester-hour course."

Simply stated, his transcript shows that J.B. held a Master of Science in Education with a Major in Reading, Writing, and Literacy.  Opposition, Ex. U.  This is a degree in a closely related field.  See Motion, Ex. C (defining acceptable closely-related fields and providing that "Some advanced degrees in Education, e.g., Developmental Education, Adult Education, and Adult Language Acquisition, may contain a significant concentration in English or linguistics to qualify[.]").  J.B. is thus not similarly situated to Plaintiff, and is not a proper comparator, because he met the stated qualifications for the position.[9]

Moreover, conspicuous by its absence from Plaintiff's Opposition is any attempt to distinguish the only other applicant who actually *is* similarly situated: A.F.  Unlike J.B., who was not part of the same hiring pool as Plaintiff, but was considered for hire five years earlier, see Opposition at 10 (noting J.B. was hired in 2010), A.F. *was* considered, along with Plaintiff, for hire to the English Generalist position in 2015.  Plaintiff makes no attempt to distinguish A.F. because he simply cannot.  Unlike every other candidate in the pool of applicants to interview with Dr. Gay and Dr. Thompson in 2015, both Plaintiff and A.F. lacked a graduate degree in

---

[9]     Even if the Court considers Plaintiff's unsupported conclusions about J.B.'s qualifications, this is insufficient to establish that the proffered reason CCP declined to hire Plaintiff was pretext for discrimination, as set forth in detail below.  See Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 646 (3d Cir. 1998) (holding inference of discrimination based on favorable treatment of a single member of non-protected group may be acceptable at *prima facie* stage, where the inquiry is based on a few generalized factors, but is not necessarily acceptable at pretext stage, where factual inquiry into alleged discriminatory motives rises to a new level of specificity).

English or a closely related field. See Motion at 10-11.[10] A.F., who is not within either of Plaintiff's protected classes, is the only similarly situated comparator to him, and both she and Plaintiff were treated in exactly the same way because they both lacked the minimum qualifications for the position. Id. at 10. No inference of discrimination can arise where the evidence makes clear that the only person similarly situated to Plaintiff was not treated more favorably than him, but was in fact treated in exactly the same way in that neither were recommended for the position.

### B. Plaintiff's Opposition Fails To Establish That The Legitimate Reason Plaintiff Was Not Selected – His Lack Of Qualifications – Was Pretext For Discrimination.

Plaintiff has failed to address the legitimate reason for the failure to hire him (his lack of a graduate degree in English or a closely-related field), or explain how that reason was pretext for discrimination. At best, Plaintiff suggests that the assessment of his qualifications was inaccurate or misinformed. But "pretext is not shown by evidence that 'the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.'" Smith v. Thomas Jefferson Univ., No. 05-2834, 2006 WL 1887984, at *5 (E.D. Pa. June 29, 2006) (granting summary judgment for employer where plaintiff's efforts to establish that she was qualified for position did not undermine employer's honest motives in making the adverse employment decision) (citation omitted). As the Third Circuit has explained, in conducting the pretext analysis, the Court's inquiry is "limited to whether the employer gave an honest explanation of its behavior." Shahin v. State of Delaware Dep't of Fin., 619 F. App'x 91, 94, n.2 (3d Cir. 2015), reh'g denied (Nov. 18, 2015).

---

[10] Unlike J.B., who has a Master of Science in Education with a Major in Reading, Writing, and Literacy, A.F. has a Master of Education with coursework focused on teaching and urban education. See Opposition, Ex. Y.

His protestations to the contrary notwithstanding, Plaintiff's subjective beliefs about his own qualifications, or the qualifications of other applicants, do not establish that he was treated less favorably on the basis of race and gender, or that the stated reason for the failure to hire him was dishonest or pretext.[11]  Plaintiff has no "facts of record to support that he was more qualified than the candidates hired in his place."  The one example he cites – that he had more "internal work experience" – is simply not indicative of discrimination when a candidate's internal work experience was not relevant to the hiring decision.  See, e.g., Ruff v. Temple Univ., 122 F. Supp. 3d 212, 218 (E.D. Pa. 2015) (holding employee's subjective comparison of qualifications between himself and other candidates did not cast doubt on university's legitimate reasons for selecting other candidates for promotion, even though employee had more seniority at university than other candidates, as there was no evidence university considered seniority relevant in promotion process).

Though Plaintiff may believe that he was qualified, the strength of his qualifications in relation to the English Generalist position "is not [his] decision to make."  Steele v. Pelmor Labs. Inc., 642 F. App'x 129, 135 (3d Cir. 2016).  Specifically, "[m]ore than a denial of promotion as a result of a dispute over qualifications must be shown to prove pretext."  Id.  (quoting Bennun v. Rutgers State Univ., 941 F.2d 154, 170 (3d Cir. 1991)).  Instead, to demonstrate pretext:

---

[11]  To the extent Plaintiff argues there were inconsistencies in the 2015 hiring process, he again misrepresents the record facts.  Specifically, Plaintiff suggests, based on a spreadsheet used by Human Resources to track applicants, that certain applicants were not required to interview with the Hiring Committee.  See Opposition at 5.  Clearly, this spreadsheet was not fully up-to-date.  Certain of the applicants are marked as "No" in the column indicating whether they were hired, but there is no question that these applicants were, in fact, actually hired.  Furthermore, Plaintiff ignores the memorandum from the Hiring Committee Chair, Linda Fellag, to Girija Nagaswami, which lists each of the applicants recommended for interviews with Ms. Nagaswami and states "Hiring Committee members scrutinized the teaching practices of 35 finalists as evidenced by their CVs, ***interviews***, teaching demonstrations, graded essays, and statements of teaching philosophy."  See Motion, Ex. M (emphasis added).

> [A plaintiff] must show that the qualifications of the person
> actually promoted were *so much lower* than those of h[is]
> competitors that a reasonable factfinder could disbelieve the claim
> that the employer was honestly seeking the best qualified
> candidate. In the absence of such a significant degree of difference
> in qualifications that may arouse a suspicion of discrimination, we
> defer to the employer's hiring decisions, as Title VII was not
> intended to diminish traditional management prerogatives.

Id. (internal citations and quotations omitted; emphasis in original). Plaintiff cannot make such a demonstration. He completely ignores the uncontroverted fact that every applicant who *was* hired in 2015 had a graduate degree in English, and that the only truly similarly situated comparator to him (a White female) was treated in exactly the same way that he was – neither were recommended for hire because they both lacked the required graduate study in the English discipline. See Motion at 10.

Courts of this District have reiterated time and again that the Court does "not sit as a super-personnel department that reexamines an entity's business decisions. The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is [discrimination]." Smith, No. 05-2834, 2006 WL at *5 (citation omitted). See also Gardner-Lozada v. SEPTA, 643 F. App'x 196, 200, n.7 (3d Cir. 2016) ("Even were we skeptical of SEPTA's evaluation of the applicants' relative qualifications, we would consider that issue, as the jury should have, under a standard deferential to its determination. 'The fact that a court may think that the employer misjudged the qualifications of the applicants does not in itself expose him to Title VII liability....' To the contrary, '[e]vidence establishing [the] incredibility' of the employer's qualification determination 'must show that the standard ... the employer relied on was obviously weak or implausible.'") (citations omitted). Plaintiff has simply failed to offer any evidence that the decision not to recommend him for hire was based on "weak or implausible" criteria. In fact, the record demonstrates the exact opposite. Plaintiff cannot

overcome summary judgment without demonstrating that this decision was pretextual and this he simply cannot do.

## III. CONCLUSION

For any and all of the foregoing reasons, and for those set forth in its Motion for Summary Judgment, Defendant, Community College of Philadelphia, respectfully requests that this Court grant its Motion for Summary Judgment pursuant to Rule 56(c), and enter an Order entering judgment in favor of Defendant and against Plaintiff on all claims.

Respectfully submitted,

*/s/ Danielle Banks*

Danielle Banks
Chelsea A. Biemiller
Stradley, Ronon, Stevens & Young, LLP
2600 One Commerce Square
Philadelphia, PA  19103-7098
(215) 564-8000 (phone)
(215) 564-8120 (fax)

Attorneys for Defendant,
Community College of Philadelphia

Dated:  November 11, 2016

## **CERTIFICATE OF SERVICE**

I, Danielle Banks, hereby certify that on this 11th day of November, 2016, I caused a true and correct copy of the foregoing Reply Memorandum of Law to be filed via the Court's ECF system which constitutes service upon the following:

Christopher J. DelGaizo
Kraemer, Manes & Associates, LLC
Parkview Tower
1150 1st Avenue, Suite 501
King of Prussia, PA 19406
(610) 616-5690

*Attorney for Plaintiff*

Dated: November 11, 2016                    */s/ Danielle Banks*
                                            Danielle Banks

# 3013390