# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BRARAILTY DOWDELL** | : | **CIVIL ACTION** |
| *Plaintiff* | : | |
| | : | **NO. 15-6806** |
| **v.** | : | |
| | : | |
| **COMMUNITY COLLEGE OF** | : | |
| **PHILADELPHIA** | : | |
| *Defendant* | : | |

NITZA I. QUIÑONES ALEJANDRO, J.                                                        June 9, 2017

# MEMORANDUM OPINION

## INTRODUCTION

Plaintiff Brarailty Dowdell ("Plaintiff") filed an employment discrimination action based on race and gender against Defendant Community College of Philadelphia ("Defendant"), his current employer, pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII") and 42 U.S.C. § 1981 ("§ 1981"). Presently before this Court is Defendant's motion for summary judgment to which Plaintiff filed an opposition, Defendant filed a reply, and Plaintiff filed a sur-reply. [ECF 21, 22, 23, 26, respectively]. The issues presented in the motion for summary judgment have been fully briefed by the parties and are ripe for disposition. For the reasons stated herein, the motion for summary judgment is granted.

## BACKGROUND

In his complaint, which was filed on December 24, 2015, Plaintiff alleges that Defendant discriminated against him on the basis of his race and gender when Defendant failed to hire him

for a full-time faculty position in Defendant's English Department. [ECF 1].[1] Specifically, Plaintiff asserts Title VII claims for: intersectional race and gender discrimination (Count One); race discrimination (Count Three); and gender discrimination (Count Four); and a race and gender discrimination claim under § 1981 (Count Two).

As is required at the summary judgment stage, this Court will consider all relevant facts in this matter in the light most favorable to the non-moving party, *i.e.*, Plaintiff. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The facts relevant to Plaintiff's tenure with Defendant are summarized as follows:[2]

> Plaintiff, an African American male, is currently employed by Defendant on a part-time basis in the Learning Lab tutoring students. (Pl.'s Br., [ECF 22-2], at 1) (citing Tr. of Pl.'s June 20, 2016 Deposition [ECF 22-3] at 6, 10-12, 19-20). Prior to joining Defendant, Plaintiff received a Bachelor of Arts degree in English from Fisk University and a Master's of Science degree in Film with a concentration in screenwriting from Boston University. (*Id.*). Plaintiff's thesis was a screenplay for *Train Ride*, which became his first feature film.[3] (*Id.* at 1-2) In 1999, after Plaintiff had graduated, Boston University changed its graduate Film degree to a Master's of Fine Arts degree; and, in 2015, it added a Screenwriting sub-discipline, not previously offered. (*Id.* at 2).
>
> In 2003, Plaintiff began his employment with Defendant as an adjunct professor in the English Department. (*Id.*). Plaintiff remained in this position for three or four years, before working as a tutor in Defendant's Learning Lab in 2006, tutoring students

---

[1]    Plaintiff styled his claims as "failure to hire" claims. However, because Plaintiff was already employed by Defendant, these claims are more appropriately considered to be failure to promote or select claims. Because Defendant does not take issue with the naming of Plaintiff's claims, and because the legal analysis is the same for failure to hire and failure to promote claims, this Court will, for the purposes of this Memorandum Opinion, identify Plaintiff's claims as failure to hire claims.

[2]    The facts are taken from the parties' respective briefs. To the extent facts are disputed, such disputes are noted and, if material, construed in Plaintiff's favor. Facts asserted by a party, supported by the record, which are uncontested, whether directly or by implication, by the other party, are taken to be true. *See* Fed. R. Civ. P. 56(c).

[3]    *See* http://www.imdb.com/title/tt0161003 (last visited on June 9, 2017).

primarily in English courses.  (*Id.*).  In 2012 or 2013, Plaintiff taught a Scriptwriting course, considered a course in the English Department.  (*Id.*).  Plaintiff notes that Defendant has advertised Plaintiff on Facebook, poster board, and Defendant's February 2014 Report for Reaccreditation, and has also recognized him as "Accomplished Faculty."  (*Id.* at 2-3).

In 2005, Plaintiff applied for a full-time faculty position in the English Department.  (*Id.* at 3).[4]  Plaintiff interviewed with Dr. Judith Gay, Vice President of Academic Affairs, and Dr. Sharon Thompson, Dean of Liberal Arts and Associate Vice President of Academic Affairs.  (*Id.*).  Dr. Gay is an African American woman, and Dr. Thompson is a Caucasian woman.  (*Id.*).  At the time, Dr. John Howe was the English Department Chair and Doug Swauger was the Hiring Committee Chair.  (*Id.*).  Of the 207 applicants for the full-time position, forty were interviewed, and of those interviewed, eighteen were recommended to the English Department Chair, and eight  were hired, none of whom were African American men.  (*Id.*).  No reason was given for Plaintiff's non-hiring.  (*Id.*).

In December 2014, Defendant posted a full-time faculty position for an English Generalist professor for the Fall 2015 semester in Defendant's English Department.  (Def.'s Br. at 2; [ECF 21-2]).  The posting indicated that a "Master's or Ph.D. degree in English, Composition, or closely-related field [is] required.  The MFA degree will also be considered."  [ECF 21-2 at 2].  For an English Generalist position, "closely-related fields" are those that:

> involve advanced study in language, literature, developmental English or reading.  Closely related fields are:  Rhetoric, Composition, Reading, American Studies, Literature, Humanities, Classics, Communications, the M.F.A in Creative Writing and certain other M.F.A and master's degrees depending on inclusion of literary study and whether the applicant has a credible undergraduate degree in English.

> The normal expectation for closely-related degrees is that either the degree is earned in a humanities department from a graduate school of Arts and

---

[4]     Plaintiff's discrimination claims are not based on Defendant's failure to hire him as an English Generalist in 2005.  This information is provided for context.

Sciences, with methods of study approximating those used in the study of English, or that the degree is earned in an education department, with the focus on developmental English studies not administrative duties. The closely-related field must include a significant attention to the English language, its structure, history or the works of art produced in English. Degrees which lack these elements are unacceptable.

[ECF 22-13 at Ex. S at 2].

On December 14, 2014, Plaintiff applied for the full-time English Generalist vacancy position announcement, (Pl.'s App., [ECF 21-6], at 1), despite not having a Master's or Ph.D. degree in English or Composition, an advanced degree in Rhetoric, Composition, Reading, American Studies, Literature, Humanities, Classics, or Communications, or a Master's of Fine Arts. On his application, Plaintiff identified his Master's of Science in Film as a "Master's" in "Screenwriting/Film." (Pl.'s App. at 3).

Defendant received 376 applications for the announced English Generalist position. (Def.'s Br. at 4). The hiring process consisted of the following: the Human Resource Department performed an initial review of the materials received based on the applicant's self-reporting to determine who met the minimum required qualifications. (*Id.* at 4-5). As to Plaintiff's application, the Human Resources Department concluded that he "[m]ay meet minimum qualifications." (*Id.* at 5; Pl.'s Br. at 5); [ECF 21-10 at 6]. The list of screened candidates was reviewed by the Director of Diversity and Equity to ensure that minority applicants were represented, and then forwarded to the Hiring Committee to select candidates for a first round of interviews. (Def.'s Br. at 5). The Hiring Committee reviewed the forwarded applications and selected the candidates to interview. (*Id.*). Three members of the Hiring Committee recommended Plaintiff for advancement, four voted "maybe," and one member noted that Plaintiff may have a "degree issue." [ECF 21-11 at 9; ECF 21-12 at 4].

The Hiring Committee recommended thirteen candidates for a second interview before Girija Nagaswami, the English Department Chair, and Joseph Kenyon, the Assistant Chair. [ECF 21-13 at 3]. Of those referred, six candidates were considered "First Tier," because they received unanimous support from the Hiring Committee, and seven were considered "Second Tier," because they lacked unanimous support. (Def.'s Br. at 6); [ECF

21-11 at 9; ECF 21-13 at 3]. Of the thirteen candidates selected for the second interview, Plaintiff was ranked twelfth. [ECF 21-13 at 3].

After the second round of interviews was completed, Ms. Nagaswami sent Drs. Gay and Thompson a memorandum indicating that ten of the thirteen candidates, including Plaintiff, in Ms. Nagaswami's opinion, were qualified for the position. [ECF 21-14 at 2]. In an October 20, 2016 declaration submitted with Defendant's motion, Ms. Nagaswami indicates that the Spring of 2015 was her first experience interviewing candidates as Chair of the English Department, and at the time she recommended Plaintiff to proceed to the third round of interviews with Drs. Gay and Thompson, she had not reviewed Plaintiff's graduate level coursework. [ECF 21-15 ¶ 4-5]. After discussing Plaintiff's academic transcript with Drs. Gay and Thompson and reviewing the relevant descriptions of the courses Plaintiff had taken, Ms. Nagaswami concluded that Plaintiff did not meet the minimum qualifications, namely, he did not have either a Master's degree in English, a M.F.A degree, or a degree in a closely-related field. (*Id.* ¶ 6-10).

Deans are encouraged to check candidate's academic transcripts to ensure that the candidates recommended for further interviews meet the minimum requirements. [Tr. of Dr. Gay August 12, 2016 Deposition, [ECF 21-4], at 16-17, 72]. Before conducting Plaintiff's third interview, Drs. Gay and Thompson reviewed his academic transcript and discovered that Plaintiff did not have a Master's degree in Film and Screenwriting, as represented in his application, but instead had a Master's of Science degree in Film. (Pl.'s App. at 4) [ECF 21-17 at 2].[5] Based on their findings, Plaintiff would only be qualified for the English Generalist position if he had a degree in a closely-related field. [ECF 21-2 at 2].

Prior to delving further into Plaintiff's academic transcript to determine if he met the minimum qualifications, Drs. Gay and Thompson proceeded with his scheduled interview. [Tr. of Dr. Thompson August 26, 2016 Deposition, [ECF 21-5], at 89:15-23]. To ensure fairness in the process, Drs. Gay and Thompson used a set list of questions for all candidates during the third round of

---

[5]     Defendant asserts that Plaintiff's application stated he had a "Master's of Arts" degree in "Film and Screenwriting." (Def.'s Br. at 7). A review of Plaintiff's application reveals that he claimed he has a "Master's" in "Screenwriting/Film." (Pl.'s App. at 4).

interviews. (*Id.* at 95:16-24); [ECF 21-18 at 2]. Using these questions, Drs. Gay and Thompson asked Plaintiff about his grading system, theories on assessments in student learning, and his familiarity with developments in the English discipline, all of which Plaintiff struggled to describe and explain. [Tr. of Dr. Thompson August 26, 2016 Deposition, [ECF 21-5], at 99:4-100:6]. The questions did not include any inquiries on Plaintiff's educational credentials.

Following Plaintiff's interview, Drs. Gay and Thompson both reviewed Plaintiff's academic transcript to determine if he had completed more than eighteen credits of graduate level work in English, literature, developmental English, or reading. (*Id.* at 15:3-16); [Tr. of Dr. Gay August 12, 2016 Deposition, [ECF 21-4], at 54].[6] Dr. Gay downloaded the current course descriptions at Boston University to see if the course numbers and/or course names that were similar to the courses Plaintiff took twenty years earlier potentially involved the study of English, literature, developmental English, or reading. [Tr. of Dr. Gay August 12, 2016 Deposition, [ECF 21-4], at 37-39]. Dr. Gay testified that she "thought if [she] could find the course numbers and some evidence that there was work that might be considered comparable to what [the] English composition description – job description was, that [Defendant] should count that and then [she] might have a basis for moving [Plaintiff] forward." (*Id.* at 31). Ultimately, Dr. Gay concluded that Plaintiff did not have more than eighteen credits at graduate level work in English, literature, developmental English, or reading. (*Id.* at 39). Both Drs. Gay and Thompson concluded that Plaintiff did not have a degree in a closely-related field, did not meet the minimum requirements for the position, and could not be recommended for the English Generalist position. (*Id.* at 5-6); [Tr. of Dr. Thompson August 26, 2016 Deposition, [ECF 21-5], at 8].

Of the applicants interviewed by Drs. Gay and Thompson, only two were not recommended for hire: Plaintiff and Alexandra Fields, a Caucasian woman, who also did not have a Master's

---

[6] Dr. Gay testified at her deposition that the requirement that the candidate have more than eighteen credits was based on Defendant requiring eighteen graduate credits for part-time faculty. [Tr. of Dr. Gay August 12, 2016 Deposition, [ECF 21-4], at 31]. She also testified that she interpreted the requirement that a "closely-related field must include a significant attention to the English language" to, at a minimum, mean more than eighteen graduate credits. (*Id.* at 31-33).

degree in English or in a closely-related field. [ECF 21-9 ¶ 12].[7] The educational credentials and racial backgrounds of the seven candidates recommended for hire are as follows: two were African American women, one had a Ph.D. in English, and the other had a M.F.A. in Creative Writing (a closely-related field); two were Caucasian men,[8] one had a Master's of Arts in English and the other had a Master's of Fine Arts in Nonfiction Writing; two were Caucasian women, both with a Master's of Arts in English and one also with a Ph.D. in English; and one was a Caucasian/Asian/Pacific Islander woman with a Ph.D. and Master's of Arts in English.

## LEGAL STANDARD

Federal Rule of Civil Procedure ("Rule") 56 governs the summary judgment motion practice. Fed. R. Civ. P. 56. Specifically, this rule provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* A fact is "material" if proof of its existence or non-existence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Under Rule 56, the court must view the evidence in the light most favorable to the non-moving party. *Galena v. Leone*, 638 F.3d 186, 196 (3d Cir. 2011).

Rule 56(c) provides that the movant bears the initial burden of informing the court of the basis for the motion and identifying those portions of the record which the movant "believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This burden can be met by showing that the nonmoving party has "fail[ed] to

---

[7]  Ms. Fields has a Bachelor of Arts in English and a Master's of Education from Harvard. [ECF 21-9 ¶ 12].

[8]  Defendant identifies this candidate as a Caucasian man. (Def.'s Br. at 10). Plaintiff identifies this candidate as: "Caucasian identifies as Male." (Pl.'s Br. at 4).

make a showing sufficient to establish the existence of an element essential to that party's case." *Id*. at 322.

After the moving party has met its initial burden, summary judgment is appropriate if the nonmoving party fails to rebut the moving party's claim by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" that show a genuine issue of material fact or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." *See* Rule 56(c)(1)(A-B). The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986). The nonmoving party may not rely on "bare assertions, conclusory allegations or suspicions," *Fireman's Ins. Co. of Newark v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982), nor rest on the allegations in the pleadings. *Celotex*, 477 U.S. at 324. Rather, the nonmoving party must "go beyond the pleadings" and either by affidavits, depositions, answers to interrogatories, or admissions on file, "designate 'specific facts showing that there is a genuine issue for trial.'" *Id*.

**DISCUSSION**

As stated, Plaintiff contends that Defendant unlawfully discriminated against him in violation of Title VII and § 1981 when Defendant denied Plaintiff the English Generalist position because of his race, gender, or the combination of the two.[9] Defendant moves for summary

---

[9]     In addition to his race and gender discrimination claims, Plaintiff raises a claim entitled "Failure to Hire – Combined/Intersectional/Race and Gender Discrimination," (Compl. at 9), in which he alleges that he was discriminated against not solely because he is African American or solely because he is a man, but because he is an African American man. (*Id.* ¶ 59-64, 75). While the Third Circuit Court of Appeals has not yet addressed intersectional discrimination claims, in a case where the plaintiff alleged he was discriminated against because he was a man of Italian ancestry, the Eastern District of Pennsylvania

judgment on each of Plaintiff's claims on the grounds that Plaintiff has not and cannot establish: (1) a *prima facie* case of discrimination based on race, gender, or a combination of two; and (2) that Defendant's articulated, legitimate and non-discriminatory reasons for not hiring Plaintiff for the English Generalist position were a pretext for discrimination. These arguments will be addressed separately.

The elements of a Title VII employment discrimination claim are generally identical to those for a § 1981[10] employment discrimination claim, and both are analyzed pursuant to the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *See Walker v. Centocor Ortho Biotech, Inc.*, 558 F. App'x 216, 218 (3d Cir. 2014); *Chandler v. Univ. of Pa.*, 927 F. Supp.2d 175, 179 (E.D. Pa. 2013) (noting that the legal standard applicable to employment discrimination claims asserted under §1981 and claims brought under Title VII are "equivalent"); *Fitzgerald v. Nat'l R.R. Passenger Corp.*, 2016 WL 3854055, at *3

---

held that a "Title VII claim may be premised on alleged discrimination based on a combination of impermissible factors." *Fucci v. Graduate Hosp.*, 969 F. Supp. 310, 316 n.9 (E.D. Pa. 1997) (internal citations omitted). Other courts have likewise found intersectional claims to be cognizable under Title VII. *See Shazor v. Prof'l Transit Mgmt., Ltd.*, 744 F.3d 948, 958 (6th Cir. 2014) ("[B]oth classifications—race and sex—are protected by Title VII. These characteristics do not exist in isolation. African American women are subjected to unique stereotypes that neither African American men nor white women must endure. And Title VII does not permit plaintiffs to fall between two stools when their claim rests on multiple protected grounds") (internal citations omitted); *Jefferies v. Harris Cty. Cmty. Action Ass'n*, 615 F.2d 1025, 1032 (5th Cir. 1980) (finding a claim that someone was discriminated against for being an African American woman was separately cognizable from claims of solely race or gender discrimination, noting that the "use of the word 'or' [in Title VII] evidences Congress' intent to prohibit employment discrimination based on any or all of the listed characteristics."); *Lam v. Univ. of Hawai'i*, 40 F.3d 1551, 1562 (9th Cir. 1994) ("[W]hen a plaintiff is claiming race *and* sex bias, it is necessary to determine whether the employer discriminates on the basis of that *combination* of factors, not just whether it discriminates against people of the same race or of the same sex."). Here, because this Court concludes that Plaintiff has failed to establish a *prima facie* case of discrimination and/or that Defendant's reasons for not hiring Plaintiff were pretextual in nature, this Court need not determine whether an intersectional race/gender discrimination claim is cognizable under Title VII.

[10] In relevant part, § 1981 provides: "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . and to the full and equal benefit of all laws and proceedings for the security of person and property as is enjoyed by white citizens . . . ." 42 U.S.C. § 1981(a).

(E.D. Pa. July 13, 2016).  Under the *McDonnell Douglas* framework, a plaintiff must first make a *prima facie* case of discrimination by producing evidence to show that the plaintiff: (1) is a member of a protected class; (2) is qualified for the job which he sought to attain; (3) suffered an adverse employment action; and (4) that the action occurred under circumstances that could give rise to an inference of discrimination.  *Walker*, 558 F. App'x at 218.  Defendant concedes that Plaintiff satisfies the first and third elements on his race discrimination and intersectional discrimination claims.  (Def.'s Br. at 14 n.5, 18 n.10).  Regarding Plaintiff's gender discrimination claim, because this claim is premised upon his being male, it is considered to be a "reverse discrimination" claim.  *Andersen v. Mack Trucks, Inc.*, 118 F. Supp. 3d 723, 744 (E.D. Pa. 2015).  "In cases involving reverse discrimination, the Third Circuit has articulated a modified burden shifting analysis that differs from the usual test for gender discrimination enunciated by the Supreme Court in *McDonnell Douglas*."  *Id. (citing Iadimarco v. Runyon,* 190 F.3d 151 (3d Cir.1999)).  "Under *Iadimarco,* the plaintiff must establish a *prima facie* case by presenting sufficient evidence to allow a fact finder to conclude that the defendant treated some people less favorably than others based on gender."  *Id.*

Once a plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for the adverse employment action.  *McDonnell Douglas*, 411 U.S. at 802.  If the defendant satisfies this phase, the burden shifts back to the plaintiff to prove that the legitimate reason(s) offered by the defendant are merely a pretext for discrimination.  *Fuentes v. Perskie*, 32 F.3d 759, 804-05 (3d Cir. 1994).  To make a showing of pretext, the plaintiff must provide evidence "from which a fact-finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause

of the employer's action." *Id.* at 764. To meet this burden, the plaintiff must "present evidence contradicting the core facts put forth by the employer, as the legitimate reasons for its decision." *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 467 (3d Cir. 2005). The plaintiff must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Fuentes*, 32 F.3d at 765. *Fuentes* further requires the plaintiff to present evidence that suggests that the unlawful discrimination alleged was more likely than not a motivating or determining factor in the defendant's adverse employment actions. That is, the plaintiff must do more than show that the defendant's proffered reasons were wrong or mistaken; the plaintiff must demonstrate that the defendant acted with discriminatory animus. *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 283 (3d Cir. 2001). The plaintiff can meet this burden by pointing to evidence "that the employer has previously discriminated against [him], that the employer has discriminated against other persons within the plaintiff's protected class or within another class, or that the employer has treated more favorably similarly situated persons not within the protected class." *Simpson v. Kay Jewelers*, 142 F.3d 639, 645 (3d Cir. 1998). In situations of similarly situated non-class members, a plaintiff must show with some specificity that the comparators were more favorably treated. *Id.* at 646.

### *Plaintiff Fails to Make Prima Facie Case*

Defendant argues that Plaintiff has failed to make a *prima facie* case of either race, gender, or combined race/gender discrimination because he cannot establish that he met the minimum qualifications for the English Generalist position. This Court agrees.

It is undisputed that the educational qualifications requirement for the English Generalist position included a Master's (or possibly Master's of Fine Arts) degree or Ph.D., in either: (1)

English; (2) Composition; or (3) a closely-related field. [ECF 21-2 at 2]. It is also undisputed that Plaintiff does not have a Master's or Ph.D. degree in English or Composition. Thus, the central dispute over Plaintiff's qualifications is whether, when viewing the evidence in the light most favorable to him, Plaintiff's Master's of Science in Film degree with a concentration in screenwriting is a degree in a "closely-related field."[11] A closely-related field "must include a significant attention to the English language, its structure, history or the works of art produced in English. Degrees which lack these elements are unacceptable."[12] [ECF 22-13 at Ex. S at 2].

The definition of closely-related degrees does not provide a definition or context for the phrase "significant attention." However, since 2005, Defendant has required part-time

---

[11] Plaintiff appears to argue, *inter alia*, that he has a "degree in screenwriting" and that such a degree constitutes a degree in a closely-related field. (Pl.'s Br. at 12). To support this argument, Plaintiff notes that Dr. Gay agrees that a degree in screenwriting fits the closely-related field description. (Tr. of Dr. Gay August 12, 2016 Deposition, [ECF 22-5], at 24:15-18). Plaintiff further argues that Defendant has "recognized Plaintiff Dowdell as having that degree," (Pl.'s Br. at 12), citing a September 2, 2003 letter from Dr. Howe to Dr. Gay that recommended Plaintiff to teach two English courses, noting that he has a "M.S. from Boston University in Film/Screenwriting." [ECF 22-13 at Ex. W at 2]. The fact that Dr. Howe, in a single letter to Dr. Gay in 2003 identified Plaintiff's Master's degree as being one in "Film/Screenwriting" does not change the undisputed fact that Plaintiff does <u>not</u> have a degree in screenwriting. Plaintiff admits that he has a "Master's of Science in Film with a concentration in screenwriting." (Pl.'s Br. at 1). It is this degree that must constitute a degree in a closely-related field in order for Plaintiff to meet the stated qualifications of the English Generalist position.

[12] Plaintiff also argues that his Film degree is closely-related because it is a Humanities degree, one of the enumerated degrees listed as closely-related. (Pl.'s Br. at 13). Plaintiff cites to *Wikipedia* to support his contention that a Film degree constitutes a closely-related Humanities degree. (*Id.*) (citing https://en.wikipedia.org/wiki/Humanities). Setting aside the potential problems with relying on Wikipedia to support a factual proposition, *see Doe 1 v. Michigan Dep't of Corr.*, 2014 WL 2207136, at *7 n.3 (E.D. Mich. May 28, 2014) (collecting cases), Wikipedia references Film as a part of the Humanities academic discipline in a list of the Performing Arts, which includes "acrobatics, busking, comedy, dance, film, magic, music, opera, juggling, marching arts, such as brass bands, and theatre." *See* https://en.wikipedia.org/wiki/Humanities. Thus, if Plaintiff's argument that any degree in the Humanities sufficed to satisfy the closely-related degree requirement is accepted, then, according to Wikipedia, a Master's degree in magic or juggling would also satisfy this requirement. No reasonable factfinder could reach such a conclusion. Further, Plaintiff's argument that because his Film degree is a Humanities degree qualifies him for the English Generalist position ignores the additional explanation of closely-related degrees requiring "significant attention to the English language, its structure, history or the works of art produced in English."

professors to possess at least eighteen graduate level credits in their discipline.  [Tr. of Dr. Gay August 12, 2016 Deposition, [ECF 21-4], at 31-33].  With this criteria in mind, Drs. Gay and Thompson reviewed Plaintiff's academic transcript to determine his qualifications and whether he had, at a minimum, more than eighteen credits of graduate level work in English, literature, developmental English, or reading.  (*Id.* at 54); [Tr. of Dr. Thompson August 26, 2016 Deposition, [ECF 21-5], at 15:3-16].  Ultimately Drs. Gay and Thompson concluded that Plaintiff was not qualified for the position since he did not have more than eighteen credits of graduate level work in English, literature, developmental English, or reading, nor did he have a degree in a closely-related field.  [Tr. of Dr. Gay August 12, 2016 Deposition, [ECF 21-4], at 5-6, 39], [Tr. of Dr. Thompson August 26, 2016 Deposition, [ECF 21-5], at 8].

Plaintiff does not appear to take issue with Drs. Gay and Thompson's use of a "more than eighteen credits" threshold to determine whether he had a closely-related degree.[13]  Instead, Plaintiff argues that the review of his academic transcript to determine whether specific courses qualified as English, literature, developmental English, or reading courses, is subjective and, therefore, should not be considered during the *prima facie* case analysis but instead should be considered during the pretextual part of the *McDonnell Douglas* analysis.  [Pl.s' Br. at 13-16]. Plaintiff, however, has failed to realize that it is his burden to show that he is qualified for the position and/or to rebut Defendant's evidence that he is not qualified.  *See* Rule 56(c)(1)(A-B); *Fuentes*, 32 F.3d at 764-65.  Plaintiff has not cited "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" which would rebut

---

[13]     In light of the fact that part-time positions require at least eighteen graduate credits in the relevant discipline, it appears that simply requiring more than eighteen, such as nineteen graduate credits, in order to be qualified to assume a full-time position, is more than reasonable.

Defendant's factual assertions and, therefore, show a genuine issue of material fact or otherwise "establish the absence or presence of a genuine dispute." *See* Rule 56(c)(1)(A-B). While Drs. Gay and Thompson's review of Plaintiff's specific graduate courses may have been subjective, to defeat the motion for summary judgment, Plaintiff has the burden to rebut their conclusion regarding the lack of relevant graduate credits, and he has failed to do so. Instead, Plaintiff merely states that he "was asked and identified during the deposition the graduate degree credits with a focus in the English language." [Pl.'s Br. at 9] (citing Tr. of Pl.'s June 20, 2016 Deposition, [ECF 22-3], at 33-35). Setting aside the possible distinction between whether courses that "focus" on the English language are the equivalent of courses that include "significant attention to the English language, its structure, history or the works of art produced in English," Plaintiff does not identify which courses, or how many credits, in his opinion, should have been considered and counted by Drs. Gay and Thompson.[14] In essence, Plaintiff argues bare assertions and conclusory allegations to support his contention that he is qualified for the English Generalist position because he has a closely-related degree. This is insufficient to satisfy his summary judgment burden to rebut Defendant's argument and supporting facts which establish a lack of a degree in a closely related field.[15] As a result, Plaintiff cannot establish that

---

[14]     Notably, in his response, Plaintiff did not include pages 33-35 of his deposition, which prevents this Court from determining if, during his deposition, he identified more than sufficient credits which should have been counted. Defendant included page 33 of Plaintiff's deposition transcript, but this single page does not provide this Court with sufficient information to determine if Plaintiff identified the requisite number of credits.

[15]     As noted *supra*, Plaintiff argues that because Drs. Gay and Thompson's determination of which courses should and should not count is subjective, their determination should not be considered during the *prima facie* case stage and instead should be reserved for when the Court considers whether Defendant's articulated reasons were pretextual. [Pl.s' Br. at 13-16]. Plaintiff is correct that, generally, "while objective job qualifications should be considered in evaluating the plaintiff's *prima facie* case, the question of whether an employee possesses a subjective quality, such as leadership or management skill, is better left to the later stage of the *McDonnell Douglas* analysis." *Weldon v. Kraft, Inc.*, 896 F.2d 793, 798 (3d Cir. 1990) (noting that "subjective evaluations are more susceptible of abuse and more likely to

a genuine dispute of material fact exists over whether he is qualified for the position under the second prong to establish a *prima facie* case under the *McDonnell Douglas* framework.[16]  As such, Plaintiff's discrimination allegations are unsupported.

While this Court need not address the remaining *McDonnell Douglas* factors, in the interest of judicial economy, it will address the additional showing Plaintiff must establish.  For clarity of analysis and for this purpose only, this Court will assume that Plaintiff has established, which he has not, that he is qualified for the English Generalist position.

As to the fourth prong to establish a *prima facie* case  under the *McDonnell Douglas* framework, Plaintiff asserts that the adverse employment action occurred under circumstances that could give rise to an inference of discrimination, and/or that similarly situated persons who are not members of Plaintiff's protected class were treated more favorably.  To establish an inference of discrimination, a plaintiff must produce "evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion."  *Kier v. F. Lackland & Sons, LLC*, 72 F. Supp. 3d 597, 608 (E.D. Pa. 2014) (quoting *Pivirotto v. Innovative Sys., Inc.,* 191 F.3d 344, 355 (3d Cir. 1999)).  "An inference of race-based discrimination cannot arise simply from an employee's subjective belief that his or her race somehow influenced the challenged employment action."  *Id.* at 609.  One method by which a plaintiff can establish an inference of discrimination is by demonstrating that he was treated less favorably than a similarly

---

mask pretext.") (internal quotations omitted).  This argument, however, is a red herring, as Plaintiff has failed to present factual support, or even to argue, that, in his own subjective opinion, he has more than eighteen requisite graduate credits to support that he is qualified for the English Generalist position.

[16]      Plaintiff also asserts that the fact that he made it to the final stages of the hiring process in both 2005 and 2015 show that he was deemed qualified by Defendant.  [Pl.'s Br. at 14-15].  That he was "deemed qualified" enough to reach Drs. Gay and Thompson was based on his self-reporting of his qualification and was not based on an independent review of whether he had a degree in a closely-related field, a review that Drs. Gay and Thompson later performed.  That he made it through the first two rounds of interviews does not mean he was ultimately qualified for the English Generalist position.

situated employee outside of the protected class.  *Yan Yan v. Fox Chase Cancer Ctr.*, 2014 WL 4639400, at *8 (E.D. Pa. Sept. 18, 2014).

To support the existence of an inference of discrimination, Plaintiff relies on the fact that Drs. Gay and Thompson are outside his protected group, *to wit*: Dr. Gay is an African American *woman,* and, thus, outside Plaintiff's gender, and Dr. Thompson is a Caucasian woman, outside of Plaintiff's gender and race.  [Pl.s' Br. at 16].  However, the mere fact that Drs. Gay and Thompson are outside of Plaintiff's race and/or gender class, does not, in itself, establish an inference of discriminatory intent.  *See Iadimarco*, 190 F.3d at 163 ("[T]he race of the selecting officials is not a sufficient circumstance to establish a *prima facie* case of discrimination by itself.  Although the race and/or gender of the individual(s) responsible for a hiring decision is certainly relevant, it is insufficient to establish a *prima facie* case of discrimination without more.").

Plaintiff further relies on alleged remarks made and actions taken by Drs. Gay and Thompson that Plaintiff contends suggest discriminatory intent.  [Pl.s' Br. at 16-17].  Specifically, Plaintiff presents evidence that, in 2007, Dr. Gay, when asked by another African American professor why she did not protect African American faculty, replied that she did not feel the African American faculty backed her.  [Pl.s' Br. at 6] (citing Tr. of Ardencie Hall-Karambe April 20, 2016 Deposition [ECF 22-11 at Ex. P] at 92).  Plaintiff also presents evidence that, in 2001, Dr. Thompson allegedly smiled at a "racially insensitive joke"[17] told by Dr. Howe, the then Chair of the English Department, after which she spoke with Professor Paul Wright, the

---

[17]     According to Mr. Wright, in 2001 around Dr. Martin Luther King Jr. Day, Dr. Howe told a story about the day his elementary school teacher was preparing his school for racial integration and where Dr. Howe faked a Southern accent and pretended to be the teacher and said "tomorrow children the little negro children are coming to share the school with us."  [Tr. of Paul Wright April 15, 2016 Deposition [ECF 22-9 at Ex. N] at 61].

only African American present for the joke, and asked him if he was "all right" but was insincere about her inquiry. (*Id.* at 6-7) (citing Tr. of Paul Wright April 15, 2016 Deposition [ECF 22-9 at Ex. N] at 61-63].[18]

While this Court does not condone racially charged jokes, Plaintiff's argument that these two incidents are sufficient to establish an inference of discrimination is misplaced. Even assuming that these events occurred as Plaintiff describes them,[19] these events are stray or remote remarks and/or actions, one of which occurred almost fifteen years and the other eight years before the hiring decision involving Plaintiff and, further, were not made in the context of any decision whether to recommend Plaintiff for the English Generalist position. "Stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision." *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992). The fact of Dr. Thompson smiling during an off color joke and/or Dr. Gay voicing an opinion that the African American faculty does not support her,[20] events which occurred years before the hiring decision at issue, do not, under any reasonable consideration, give rise to an inference of discriminatory intent.

---

[18]    Plaintiff also alleges that Dr. Thompson was later involved in accusations against Mr. Wright concerning an alleged $1,200 he wrongfully received from the English Department, and during this investigation Dr. Thompson accused Defendant's Affirmative Action/Diversity Director Simon Brown of gender discrimination. It is unclear how these events translate into any suggestion of discriminatory animus by Dr. Thompson.

[19]    Dr. Gay denies stating that she did not feel that that African American faculty backed her. [Tr. of Dr. Gay August 12, 2016 Deposition, [ECF 23-1], at 176-77].

[20]    Plaintiff suggests that Dr. Gay, as an African American, had a duty to make sure that African American men were hired. [Tr. of Pl.'s June 20, 2016 Deposition [ECF 21-1] at 70, 73]. No such legal duty exists, and no discriminatory animus can be ascribed to Dr. Gay for her failure to comply with this non-existent duty.

Plaintiff further cites to statistical evidence of the hiring practices of the English Department in support of the alleged inference of discriminatory intent. Specifically, Plaintiff asserts that as of 2015, the English Department had 124 members, five of which are African American men. [Pl.s' Br. at 8] (citing [ECF 22-13 at Ex. V]). Plaintiff further asserts that from 2006 to 2015, the English Department hired, under Drs. Gay and Thompson, fifty Caucasian individuals (twenty-one men and twenty-nine women), eleven African American individuals (one man and ten women), and two Hispanic individuals (one man and one woman). (*Id.*). Plaintiff concludes that these statistics show a dearth of hiring of African American men and establishes an inference of discriminatory intent.

Undisputedly, "[s]tatistical evidence of an employer's pattern and practice with respect to minority employment may be relevant" to showing discrimination. *See Ezold*, 983 F.2d at 542. However, "raw numerical comparisons . . . not accompanied by any analysis of either the qualified applicant pool or the flow of qualified candidates over a relevant time period," is not probative of discrimination. *Id.* Defendant rebuts Plaintiff's discrimination inference and provides context regarding Plaintiff's statistical arguments, which Plaintiff does not refute in any response. Specifically, Defendant contends that between 2006 and 2015, the English Department received 3,138 applications for English Generalist positions, of which 58 or 1.82% were from African American men.[21] [Def.'s Br. at 28] (citing [ECF 21-23 and 21-8]). Based on Plaintiff's numbers, the five African American men currently working as full-time faculty in the English Department comprise 4.03% of the full-time faculty. Between 2006 and 2015, only two African American men's names were forwarded to Drs. Gay and Thompson to interview for the

---

[21] In its motion, Defendant asserts that African American men made up 1.69% of the applicant pool. [Def.'s Br. at 29]. This may stem from their miscalculation that the 3 African American male applicants in 2007 out of a total of 141 applicants constituted 1.45% of that year's pool whereas it actually constitutes 2.13%. (*See id.* at 28).

full-time English Generalist position, one of whom was Plaintiff and another male who was hired and remains employed by Defendant.  [Def.'s Br. at 27 n. 16] (citing [ECF 21-23]).  It is clear that, in context, Plaintiff's contention that only five out of 124 full-time faculty members are African American men supports an inference of discrimination, is baseless, and Plaintiff's statistical evidence is not probative of Defendant's alleged discriminatory intent.  *See Ezold*, 983 F.2d at 543.[22]

Plaintiff likewise fails to establish that similarly situated persons who are not members of his protected class were treated more favorably. *Yan Yan*, 2014 WL 4639400, at *8; *Walker*, 558 F. App'x at 218.  As previously stated, of the thirteen applicants interviewed by Drs. Gay and Thompson for the English Generalist position, only two were not recommended for hire: Plaintiff and Alexandra Fields, neither of whom had a Master's degree in English or a closely-related field.  The remaining eleven applicants had either a Master's and/or Ph.D degrees in English or a closely-related field.  Thus, the only similarly situated candidate who was not in Plaintiff's protected class, Ms. Fields, was not treated more favorably than he was.

Plaintiff does not dispute that Ms. Fields was not treated more favorably.  Instead, he argues that in 2010, Drs. Gay and Thompson hired J.B.,[23] who is Caucasian, despite having a Master's degree in Education, the same graduate degree Ms. Fields possesses and, thereby, J.B., does not possess a degree in a closely-related field or more than eighteen graduate credits that

---

[22]     Plaintiff's final argument concerning an inference of discrimination, that Defendant advertised and used Plaintiff's accomplishments before failing to hire him establishes such an inference, is entirely without legal support.  Defendant's advertisement of Plaintiff's accomplishments does not establish that Plaintiff was discriminated against when Defendant failed to hire him.

[23]     Plaintiff identifies this individual by the initials "EGB," and states that he is a "Caucasian female who identifies as male."  [Pl.'s Br. at 10].  "EGB" were the initials that appear on J.B.'s graduate transcript. This Court will refer to this individual as J.B.

paid significant attention to the English language. [Pl.s' Br. at 10, 19].[24] In other words, Plaintiff argues that J.B. is similarly situated to Plaintiff because she does not have a closely-related degree and yet she was treated more favorably.

Defendant contests the mischaracterization of J.B.'s graduate degree and argues that J.B.'s degree is a Master's of Science in Education, with a major in Reading, Writing, and Literacy.[25] (Def.'s Br. at 11) (citing [ECF 22-13 at Ex. U] at 2) His course studies included numerous courses in English and Literature, such as, *inter alia*, Adult Literacy, Reaching Reading and Study at Colleges & Universities, and Literature for Children and Adolescents. [ECF 22-13 at Ex. U at 2]. Defendant contends that J.B.'s graduate transcript identifies more than eighteen credits of graduate level work in English, literature, developmental English, or reading,[26] and, as a result, J.B. has a closely-related degree and was qualified for the English Generalist position for which he was hired.

Defendant's argument is supported by the factual record. A review of the supporting documents establishes that J.B. completed more than eighteen graduate credits in English, literature, developmental English, or reading and, thus, his Master's degree is one in a closely related field. Plaintiff's conclusory assertion that because J.B.'s Master's degree is in Education it cannot be considered to be a closely-related degree is entirely unsupported. That J.B.'s Master's degree is in Education does not, in and of itself, determine whether J.B. has a degree in

---

[24]     Plaintiff also notes that J.B. does not have a Bachelor's degree in English. [Pl.'s Br. at 19]. Because the job posting listing the minimum qualifications does not identify any specific Bachelor's degree an applicant must possess, but, rather, focuses entirely on Master's degrees or Ph.Ds, J.B.'s undergraduate degree is not relevant to whether J.B. was qualified for the English Generalist position.

[25]     Ms. Fields' graduate coursework focused on teaching and urban education. [ECF 22-15].

[26]     The University of Pennsylvania does not assign "credits" to its classes but rather "credit units," each of which is the equivalent four-semester-hour course. [ECF 23-5 at 2].

a closely-related field.  Instead, it was Drs. Gay and Thompson's review of this transcript and the course description which revealed that the courses paid "significant attention to the English language, its structure, history or the works of art produced in English," the same standard that was applied to Plaintiff and Ms. Fields that contributed to the closely-related field determination. Because the undisputed facts support that J.B. had a Master's degree in a closely-related field, Plaintiff has failed to establish that J.B. was similarly situated to Plaintiff.  As a result, no discriminatory intent can be assumed based upon Defendant's hiring of J.B. as an English Generalist, and Plaintiff has failed to establish that any similarly situated individuals who are not part of Plaintiff's protected classes were treated more favorably.

Based on the totality of the evidence considered, Plaintiff has not established the fourth prong to establish a *prima facie* case under the *McDonnell Douglas* framework, namely that there is a genuine dispute of material fact such that a reasonable factfinder could conclude that the adverse employment action occurred under circumstances that could give rise to an inference of discrimination[27] or that similarly situated persons who are not members of Plaintiff's protected classes were treated more favorably.  Accordingly, because Plaintiff relies primarily on "bare assertions, conclusory allegations or suspicions," and does not provide factual support to show that he is qualified for the English Generalist position, that the failure to hire him was done under circumstances that could give rise to an inference of discrimination, or that similarly situated persons who are not members of Plaintiff's protected class were treated more favorably,

---

[27]    Regarding Plaintiff's separate race and gender discrimination claims, the fact that several men and several African Americans were approved by Drs. Gay and Thompson and hired in 2015 for the English Generalist position Plaintiff applied for "undercuts Plaintiffs claim that the decisions were motivated by racial [or gender-based] animus."  *See Fitzgerald*, 2016 WL 3854055, at *5; *see also Ansell v. Green Acres Contracting Co.*, 347 F.3d 515, 524 (3d Cir. 2003) ("an employer's favorable treatment of other members of a protected class can create an inference that the employer lacks discriminatory intent.").

Defendant is entitled to summary judgment on Plaintiff's race, gender, and intersectional claims under Title VII and his race and gender discrimination claims under § 1981.

### Plaintiff Failed to Show Pretext

Plaintiff has also failed to demonstrate that there is a genuine dispute of material fact as to whether Defendant's proffered legitimate, non-discriminatory reasons for not hiring him as a full-time English Generalist were pretext for discrimination. As noted above, once a plaintiff sets forth a *prima facie* case of discrimination, the burden shifts to the employer to set forth a legitimate non-discriminatory reason for the challenged adverse employment actions. The burden of an employer to articulate a legitimate non-discriminatory reason for its employment action is "relatively light." *Fuentes*, 32 F.3d at 763. Indeed, "[t]he employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a non-discriminatory reason for the unfavorable employment decision." *Id*. at 763.

Here, Defendant set forth the following legitimate, non-discriminatory reasons for its decision to not hire Plaintiff as a full-time English Generalist; *to wit*: Plaintiff was not qualified because he lacked the requisite graduate degree or a degree in a closely related field and did not interview well, as he was unable to explain, *inter alia*, how he would meet the basic standards of a full-time English Generalist. [Def.'s Br. at 24]. Defendant argues that Plaintiff cannot show that the articulated reasons for its decision were pretextual. (*Id.* at 25-32).

To overcome Defendant's stated reasons for its adverse employment action, Plaintiff must present evidence that could either lead a reasonable factfinder to: (1) disbelieve Defendant's articulated legitimate reasons for not hiring Plaintiff; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of Defendant's actions. *Fuentes*, 32 F.3d at 764. Plaintiff must point to evidence which would

"allow a factfinder reasonably to infer that *each* of the employer's proffered nondiscriminatory reasons . . . was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." *Id*. (emphasis in original). "While this standard places a difficult burden on the plaintiff, '[i]t arises from an inherent tension between the goal of all discrimination law and our society's commitment to free decision making by the private sector in economic affairs.'" *Id*. (citations omitted). It is not enough that the employer's decision was wrong or mistaken; rather, a plaintiff must demonstrate that "the employer's articulated reason was . . . so plainly wrong that it cannot have been the employer's real reason." *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 413 (3d Cir. 1999) (internal quotations omitted). Thus, the inquiry is not "whether the employer is wise, shrewd, prudent or competent;" but rather, "whether discriminatory animus motivated the employer." *Fuentes*, 32 F.3d at 765. "[M]ore than a denial of promotion as a result of a dispute over qualifications must be shown to prove pretext." *Steele v. Pelmor Labs. Inc.*, 642 F. App'x 129, 135 (3d Cir. 2016) (quoting *Bennun v. Rutgers State Univ.,* 941 F.2d 154, 170 (3d Cir. 1991)). Instead, a plaintiff must show "that the qualifications of the person actually promoted were *so much lower* than those of h[is] competitors that a reasonable factfinder could disbelieve the claim that the employer was honestly seeking the best qualified candidate." *Id.* (quoting *Bray v. Marriott Hotels,* 110 F.3d 986, 999 (3d Cir. 1997) (Alito, J., dissenting). "In the absence of such a significant degree of difference in qualifications that may arouse a suspicion of discrimination, we defer to the employer's hiring decisions, as Title VII 'was not intended to diminish traditional management prerogatives.'" *Id.* (quoting *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 259 (1981)). Because "the prima facie case and pretext inquiries often overlap," a court may

consider the same evidence at both stages of the *McDonnell Douglas* analysis.  *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 370 (3d Cir. 2008).

In his response, Plaintiff does not address Defendant's reasons for not hiring him nor argue the reasons offered were pretextual.  Instead, Plaintiff presents evidence that Defendant's decision was made with "discriminatory animus" similar to his argument to support the fourth prong to establish a *prima facie* case under the *McDonnell Douglas* framework.  Likewise, in his sur-reply, Plaintiff, without specifically referencing pretext, identifies additional evidence he believes supports an inference of discriminatory animus.  [ECF 26 at 2-3].  Thus, a fair reading of Plaintiff's response and sur-reply shows that Plaintiff has failed to argue that Defendant's reasons for not hiring him were pretextual.  As such, Plaintiff has failed to meet his burden to point to evidence that would "allow a factfinder reasonably to infer that *each* of the employer's proffered nondiscriminatory reasons . . . was either a *post hoc* fabrication or otherwise did not actually motivate the employment action . . . ."  *See Fuentes*, 32 F.3d at 764.

Even construing Plaintiff's evidence of discriminatory animus as evidence meant to address Defendant's pretextual arguments, *see Doe*, 527 F.3d at 370, this evidence is still insufficient to allow a reasonable factfinder to infer that Defendant's reasons were pretextual.  As previously discussed, Plaintiff relies on the stray comments and actions of Drs. Gay and Thompson, the statistical evidence of Defendant's hiring practices of African American men as English Generalists, and Defendant's prior advertisement of Plaintiff's accomplishments, as evidence which supports that Defendant's decision was made with discriminatory animus.  [Pl.'s Br. at 16-19].  For the same reasons Plaintiff's arguments were rejected when considering them in the context of the *prima facie* case analysis, these arguments are again rejected.  *See Ezold*, 983 F.2d at 542-43, 545.  In Plaintiff's sur-reply he relies on the following additional evidence: (1)

Dr. Gay told Dr. Hall-Karambe that Dr. Gay does not have a problem with the "N-word" and that Dr. Gay "has a tendency to ignore when people are being racially negative towards her;"[28] (2) Dr. Hall-Karambe testified during her deposition that Dr. Thompson discriminates against African American men;[29] and (3) Dr. Thompson "offered that skin color between mentor and mentee has no overriding significance." [ECF 26 at 2-3].[30]

While Plaintiff acknowledges that these comments are not direct to hiring, he argues that they can support his inference of discrimination claim. (*Id.*). This argument, however, lacks merit. There is simply no basis to support that Dr. Gay's alleged statements substantiate that she affirmatively sought to discriminate against Plaintiff on account of his race, gender, or both. Likewise, Dr. Thompson's alleged belief that the skin color between a mentor and mentee is insignificant has no bearing on whether Dr. Thompson sought to discriminate against Plaintiff on account of his race, gender, or both. Additionally, Dr. Hall-Karambe's belief that Dr. Thompson discriminates against African Americans is speculative at best. None of these assertions satisfy Plaintiff's "difficult burden" to put forth evidence that would allow a jury to infer that Defendant's articulated reason for not hiring Plaintiff, *i.e.*, his lack of the necessary academic credentials, was merely pretextual. In addition, Plaintiff has not presented any evidence that any of the individuals actually hired for the English Generalist position had

---

[28]     Plaintiff cites to page 96 of Dr. Ardencie Hall-Karambe's deposition transcript, which he states is attached as Exhibit A. There are no exhibits attached to Plaintiff's sur-reply, and Dr. Hall-Karambe's deposition transcript, which is attached to Plaintiff's response as Exhibit P, [ECF 22-11], does not contain page 96, so there is no way for this Court to confirm the truth of Plaintiff's factual assertion.

[29]     This deposition testimony appears in the Tr. of Ardencie Hall-Karambe April 20, 2016 Deposition [ECF 22-11 at Ex. P] at 92.

[30]     Plaintiff cites to page 57 of Dr. Thompson's deposition transcript, which he states is attached as Exhibit B. However, there are no exhibits attached to Plaintiff's sur-reply, and Dr. Thompson's deposition transcript attached to Plaintiff's response as Exhibit X, [ECF 22-14], does not contain page 57, nor does the portion of the deposition transcript attached to Defendant's motion. [ECF 21-5]. As a result, there is no way to confirm the truth of Plaintiff's assertions regarding Dr. Thompson's alleged testimony.

qualifications "so much lower than [Plaintiff's] that a reasonable factfinder could disbelieve the claim that [Defendant] was honestly seeking the best qualified candidate." *See Steele*, 642 F. App'x at 135.[31]

For the foregoing reasons, this Court concludes that Plaintiff has not put forth evidence "demonstrat[ing] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Defendant's reasons for not hiring Plaintiff, such that "a reasonable factfinder could rationally find them unworthy of credence and, hence, infer that the [Defendant] did not act for the asserted non-discriminatory reasons." *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 277 (3d Cir. 2010) (quoting *Fuentes*, 32 F.3d at 764-65). Because Plaintiff has entirely failed to put forth evidence that would allow a factfinder to conclude that Defendant's reasons for not hiring him were pretextual, Defendant is entitled to summary judgment on Plaintiff's race, gender, and intersectional claims under Title VII and his race and gender discrimination claims under § 1981.

**CONCLUSION**

Based upon the foregoing reasons, Defendant's motion for summary judgment is granted. An Order consistent with this Memorandum Opinion follows.

NITZA I. QUIÑONES ALEJANDRO, U.S.D.C. J.

---

[31] This Court notes that, while subject to a dispute of fact, it appears that the final decision-maker with respect to Defendant's hiring decisions may have been Defendant's President, Dr. Guy Generals, who is an African American man. [Def.'s Br. at 30] (citing Tr. of Dr. Gay August 12, 2016 Deposition, [ECF 21-4], at 11, 197). If true, the fact that Dr. Generals is, like Plaintiff, an African American man, undercuts any argument of pretext. *See Jakimowicz v. City of Philadelphia*, 2010 WL 2649890, at *6 (E.D. Pa. June 30, 2010) (noting that a Caucasian plaintiff had failed to establish pretext when an African American individual merely recommended the adverse employment action that was subject to approval by another Caucasian individual). However, because whether Dr. Generals was the final decision-maker is subject to a genuine dispute, this Court did not rely on this fact in reaching its decision.